Samuel Kelsall V, Esq. (SBN 141138)
Ryan Sorahan, Esq. (SBN 261042)
KELSALL LEGAL SOLUTIONS PC
815 Civic Center Drive
Oceanside, California
Telephone: (760) 722-4221
Facsimile: (760) 730-5081

Attorneys for Debtor
Samuel Kelsall V

## UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

In re:

SAMUEL KELSALL V,

     Debtor,

_____

WILLIAM J. FREED, APC, aka WILLIAM J. FREED

     Plaintiff

vs.

SAMUEL KELSALL, V

     Defendant.

_____

SAMUEL KELSALL V

Cross-Complainant

vs.

WILLIAM J. FREED, an individual, WILLIAM J. FREED, a professional corporation, dba Walwick & Freed, and DOES 1 through 10, inclusive,

Cross-Defendants

Case No.:  23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

**CROSS-COMPLAINT FOR:**

**1. FRAUD (SAMUEL KELSALL V AGAINST ALL CROSS-DEFENDANTS);**

**2. INTENTIONAL MISREPRESENTATION;**

**3. NEGLIGENT MISREPRESENTATION;**

**4. CONCEALMENT (SAMUEL KELSALL V AGAINST ALL CROSS-DEFENDANTS);**

**5. UNLAWFUL AND UNFAIR BUSINESS PRACTICES;**

**7. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING;**

**8. INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**

1 – CROSS-COMPLAINT

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

Defendants and Cross-Plaintiff, SAMUEL KELSALL V, hereby brings this cross-complaint against WILLIAM J. FREED, an individual, WILLIAM J. FREED, A PROFESSIONAL COMPANY, dba Walwick & Freed, and allege as follows:

## THE PARTIES

1.    Cross-Plaintiff, Samuel Kelsall V ("Kelsall") is an individual who resides in San Diego County, California.

2.    Upon information and belief, Cross-Defendant, William J. Freed ("Freed") is an individual who resides in San Diego County, California.

3.    Upon information and belief, Cross-Defendant, William J. Freed, A Professional Corporation, dba Walwick & Freed ("WJF Corp), is a California corporation that has its principle place of business in San Diego County, California.

4.    Upon information and belief, Freed is the president, sole director, sole officer, and owner of WJF Corp.

5.    Freed and WJF Corp will collectively be referred to hereinafter as "FREED."

## JURISDICTION

6.    This adversary proceeding is brought in connection with the underlying Chapter 7 bankruptcy, Case No. 23-01962-MM7, which Samuel Kelsall V filed on July 4, 2023 under Chapter 7 of the Bankruptcy Code (11 U.S.C. § 101 et seq.) This Court has jurisdiction pursuant to 28 U.S.C. section 1334 and General Order No. 312-E (entered 11/27/2013) of the United States District Court for the Southern District of California. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## VENUE

7.    Venue for this action is proper pursuant to 28 U.S.C. § 1409 in that it arises from or relates to the underlying bankruptcy case filed by the Defendant under Chapter 7 of the Bankruptcy Code with the United States Bankruptcy Court for the Southern District of California. This Court has jurisdiction over all causes of action asserted herein pursuant to California Constitution, Article VI, Sec 10, because this case is a cause not given by statute to other trial courts.

2 – CROSS-COMPLAINT

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

**FACTUAL ALLEGATIONS**

8.      CROSS-PLAINTIFF re-alleges by reference, all of the above paragraphs.

9.      Kelsall first saw FREED'S law practice for sale via a posting on Craig's List in 2018. That solicitation was instituted by FREED.

10.     Kelsall met with FREED, in person, no less than five or six times and engaged in active negotiations for the purchase of Freed's legal practice, known at the time as "Walwick and Freed."

11.     During the active negotiations, Freed represented to CROSS-PLAINTIFF that he was retiring from the practice of law in California and was moving to Ohio to live and practice law there.

12.     Kelsall relied upon this representation, that was made by FREED in the Summer and Fall of 2018, when he decided to purchase FREED'S law practice and building.

13.     Freed insisted that Kelsall purchase both the practice and the building, located at 815 Civic Center Drive, Oceanside, CA. ("BUILDING"), in which FREED used as an office.  FREED relayed to Kelsall that it was a "all or nothing deal."

14.     Freed represented that the BUILDING was a requirement and imperative to the sale of the legal practice because the BUILDING was where he saw all his clients and that his clients were already familiar with the BUILDING, whereby the BUILDING would generate more business for CROSS-PLAINTIFF because it would make continual contacts with FREED clients easier.

15.     FREED represented to Kelsall that he wanted to sell the BUILDING because he had already entered into escrow for the purchase of a building in Ohio and needed the funds from the sale of the BUILDING to close on the transaction in Ohio.

16.     FREED'S motivation to take the actions and failures to act were related to his desire to purchase the office building in Ohio.

17.     KLS and WJF Corp entered into an "Asset Purchase and Sale Agreement" ("AGREEMENT") on August 16, 2018 for KLS to purchase FREED'S law practice.  The AGREEMENT includes the following provision in Section 1:

> **Sale and Purchase of Assets.** … Buyer hereby purchases all of Seller's California
>
> law practice, all tangible and intangible properties in the Oceanside office and storage

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

areas, including all unknown and contingent rights, Seller's company's, goodwill, fictious business name, **intangibles**, **mailing lists**, telephone numbers, client files (except for the files of family, friends and ongoing matters specifically identified in Exhibit A, and all other assets as used in Seller's business, and a complete and accurate list of all of such assets is contained and listed in Exhibit A attached hereto and incorporated herein by this reference… . (Emphasis added)

18.     During the course of the negotiations, FREED portrayed to Kelsall and KLS that FREED'S law firm had legal services agreements with at least three thousand five hundred (3,500) clients.

19.     The AGREEMENT has the following provision in Section 3(1)(l):

Purchase of the practice is to include: all client files (approximately 3,500 matters including over 2,000 will and trust matters), except ongoing cases for family and close friends of Seller which shall be retained by Seller and a list provided to Buyer…in the event that less than 2,000 client files are transferred to Buyer, then Buyer and Seller will negotiate in good faith a purchase price adjustment if appropriate…

20.     In truth, FREED'S client list consisted of, less than One Thousand Six Hundred (1,600) Wills and Trust clients and less than Two Thousand (2,000) clients overall, that were actually transferred to CROSS-PLAINTIFFS.  In fact, numerous persons on FREED'S "client mailing list" were not even clients.

21.     The client list that FREED supplied Kelsall and KLS contained numerous persons that had already died, persons who had never been clients, and or neighbors who had never done business with FREED.

22.     Some of the alleged clients attended seminars but never became clients.  In one instance, the clerk for North County Judge Nugent was listed as a client, however he was never a FREED client and has so indicated to Kelsall and Kelsall Legal Solutions PC ("KLS").

23.     Per the California Rules of Professional Conduct, FREED was obligated to inform his clients of the sale of his practice to Kelsall and KLS.

24.     The AGREEMENT provides the following provision in Section 3(k)(iv – v):

4 – CROSS-COMPLAINT

iv.  Seller is to send a letter to client(s) informing them of the new association with Buyer….

v.  After ninety (90) days, in compliance with State Bar Rules, Seller shall send a letter informing all client(s) of Seller's retirement and retention of files in Buyer's Kelsall Legal Solutions name (i.e. transfer of client files).  Seller is to pay cost of the first mailing.  Buyer shall pay the cost of a second mailing to all client(s).

25.     FREED intentionally mailed the letters informing his alleged clients of the sale to Kelsall and KLS via "bulk mail" and in doing so FREED knew that Kelsall and KLS would not receive "returned mail," whereby "returned mail" consists of parcels with incorrect addresses, which would in turn indicate that the mailing list provided by FREED was significantly misrepresented.

26.     FREED intentionally used "bulk mail" so that Kelsall and KLS could not determine the accurate number of FREED clients with correct mailing addresses.

27.     When Kelsall and KLS used "First Class Mail," after the purported transaction closed, to introduce himself to the FREED clients, Kelsall and KLS discovered the large discrepancy in the number of clients that was represented to him by FREED because of the large number of returned mail items received by Kelsall and KLS, in large part due to the over Seven Hundred (700) bad address provided by FREED.

28.     FREED relayed to Kelsall that FREED held "trust seminars" in which he would advise the public in how to obtain Trusts and used those "seminars" to gather clients.

29.     FREED did not disclose, at any time, to Kelsall that FREED was offering lifetime services for a flat fee to the attendees of the "seminar."  This fact only came to light after Kelsall started meeting with former FREED clients. It took over a year for Kelsall to discover the fraudulent misrepresentations FREED made about his client list.

30.     The former FREED clients consistently told Kelsall that FREED told them that if they paid a little more now for their trust services there would never be any other charges in the future to change, update, modify, or administer their trust.

31.   The alleged FREED clients from the "seminars" repeated the same story over and over again about how they were solicited with the promise that they would never again have to pay for any estate planning services, ever.

32.   This false representation by FREED at the "seminars" was never disclosed to Kelsall and KLS.

33.   FREED represented to Kelsall that he had "signed Legal Service Agreements" from all the attendees of the "seminars."  Upon an exhaustive review of the files FREED transferred to Kelsall and KLS after the AGREEMENT was executed, Kelsall and KLS did not find any Legal Service Agreements between FREED and any attendee of alleged "seminars."

34.   Not only did FREED's representation not comply with California law, but it was also intentionally misleading and designed to induce Kelsall and KLS to change his position and pay money for a law practice that was falsely overvalued and worthless.

35.   Kelsall and KLS finally received the FREED Client List once the AGREEMENT was executed.  Previously FREED would not provide his client list, claiming that it was "attorney client privilege."

36.   FREED maintained this position so that Kelsall and KLS could not determine the inaccuracy of the FREED client list and or FREED's misrepresentation to clients.

37.   FREED intentionally hindered Kelsall's and KLS' good faith attempt to verify the true facts related to FREED'S law practice by not providing the FREED client list prior to the execution of the AGREEMENT.

38.   FREED clients would regularly call or come into the office seeking revisions to their Trusts and when Kelsall presented them with a request for payment for his services, they informed him that FREED promised lifetime services in exchange for the flat free they paid at the "seminar" when they signed their trust document or thereafter and they expected services to be done for free.

39.   On one occasion, former FREED clients made an appointment in the Temecula, CA office and then drove from Tucson, AZ and stayed in a hotel in order to get their trust updated for free.

40.   The AGREEMENT has the following provision in Section 3(m):

6 – CROSS-COMPLAINT

Samuel Kelsall V agrees that in accord with California Rules of Professional Conduct, Rule 2-300 he is purchasing the law practice of the Seller in good faith and with the intention of delivering legal services to client(s) of the Seller so acquired and others in need of legal services; (b) he will honor any fee agreements currently in existence between Seller and existing client(s) but reserves the right to negotiate fees with client(s) of Seller for legal representation commenced after the date of sale; and (c) he reserves the right to negotiate for reasonable limitations on the ability of the seller to reenter the practice of law as further defined under terms and conditions of this AGREEMENT.

41.     Kelsall and KLS were never informed that FREED Clients were party to a "lifetime" arrangement with FREED to receive free estate planning services for life.

42.     Kelsall and KLS were not informed by FREED that the FREED clients expected free updates and amendments to their trusts.  If FREED had told the truth, Kelsall and KLS would not have entertained purchasing FREED'S law practice.

43.     If Kelsall and KLS had known that FREED had made such representations, they would never have agreed to purchase FREED'S law practice for $200,000 because the false representation by FREED to the clients made the prospect of future services to the FREED clients worthless.

44.     FREED received payments from the "seminar" attendees but never completed the work for which he was paid for.  This fact was also not disclosed to Kelsall and KLS.  The clients for whom services were promised, but never completed, also expected their trusts to be completed for the price paid, years earlier or for free when FREED collected their money and did not finish their trusts.

45.     On or around October 2018, Kelsall met for the first time with Mr. Thompson, a former FREED client that paid FREED for the competition of a Trust package.  Mr. Thompson was a "seminar" attendee that paid FREED for complete a Trust package.  MR. Thompson stated to Kelsall that he met with Freed at the Building after the "Trust Seminar" and believed that FREED had completed Mr. Thompson's Trust.  After meeting with Mr. Thompson, Kelsall discovered that FREED never finished work on Mr. Thompson's Trust package, even though he had collected full payment.  Kelsall only found

what appeared to be incomplete drafts of a trust and no executed documents. Kelsall had to complete Mr. Thompson's Trust for a substantial discount. This is but one example where Kelsall lost money completing Trust services for Freed clients, which would not have occurred but for the misrepresentations and omissions of Freed.

46. After the sale of FREED'S law practice to Kelsall and KLS finalized, numerous FREED clients that had already paid for services requested that Kelsall and KLS complete the services for free.

47. FREED clients are now contacting Kelsall and KLS to complete the work that FREED promised to do for them and expecting Kelsall and KLS to complete the work for no additional cost or for the fee that FREED originally promised years earlier, minus any deposits that they paid FREED.

48. The AGREEMENT has the following provision in Section 8(h):

Seller's services to client(s) and all components thereof have been of a professional quality and, no claims have been filed against Seller by any client to date. Seller shall provide Buyer with access to all information related to all claims including all demands that relate in any way to any allegation whatsoever, as requested by Seller.

49. FREED did not disclose to Kelsall and KLS, at any time, of the incomplete work that he was paid to do by clients.

50. Failure to disclose unfinished legal work for any work FREED had been paid was a material omission. If Kelsall and KLS would have known that FREED collected payments from clients for services but had not performed the work, they would not have agreed to purchase the law practice.

51. Kelsall and KLS were never provided a copy of the Legal Service Agreements between FREED and those that attended FREED seminars and it is now believed that no legal services agreements existed between FREED and the attendees of the "seminars." Another misrepresentation by Freed was that FREED had legal service agreements with all of the trust clients, which FREED did not have.

52. The AGREEMENT has the following provision in Section 8(i):

All advertising, literature, promotional materials or other sales materials used by the Seller have been materially accurate and do not contain any false representations. Seller will provide Buyer with copies of all advertising materials used in the past five

8 – CROSS-COMPLAINT

(5) years and title to any intellectual property rights with respect to such advertising material possessed by Seller shall be transferred to Buyer.

53.    FREED did not provide the advertising materials to Kelsall and KLS.  It is believed that FREED destroyed the advertising materials to conceal facts as alleged herein.

54.    The AGREEMENT has the following provision in Section 8(m):

Existing Relationships.  Seller does not know of any plan or intention of any Seller's employees, material suppliers, or customers to sever relationships or existing contracts with Seller or to take another action that would adversely affect the business of Seller. Seller does not have any liability, debt, or any obligation due to, or any contractual or similar relationship, with any of its directors, officers, employees, consultants, or shareholders.

55.    The AGREEMENT has the following provision in Section 8(n):

Seller's Knowledge and Disclosure.  Seller does **not know, or have reason to know, of any matters,** occurrences, or other information that has not been disclosed to Buyer and that would materially and adversely affect the assets purchased by Buyer or its conduct of the business involving such assets. (Emphasis added)

56.    This is a materially false statement made by FREED to Kelsall and KLS as of the date of the AGREEMENT.

57.    FREED informed Kelsall and KLS of "seminars" that FREED held and showed Kelsall and KLS a map of the greater San Diego County area with push pins that represented the number of seminars held in the different locales. **Exhibit A.**  However, FREED failed to inform Kelsall and KLS of the misrepresentations made to the prospective clients at the FREED "seminars" and that omission was material.

58.    FREED induced Kelsall and KLS to purchase the FREED law practice based upon the representations that there were over two thousand (2,000) trust clients as represented by the push pins that were on the map.  However, the maps, while impressive at first glance, when counting in detail only represented a small fraction of the clients that FREED represented that he had to Kelsall and KLS.

59.     FREED also informed Kelsall and KLS that the pushpins also represented all the clients that FREED had signed legal services agreements with as a result of the seminars.

60.     The AGREEMENT has the following provision in Section 8(p):

In connection with the sale by Seller to Buyer of the goodwill of Seller's practice, Seller agrees that Seller shall not either directly or indirectly, carry on or engage in the full time practice of law defined to include recognized practice areas of Wills, Trusts, Estate Planning and Probate in San Diego County, California and all adjacent counties for a period of five (5) years from the date of this AGREEMENT.

61.     When Kelsall asked FREED why he was selling the practice, FREED replied that he was retiring from California and moving to Ohio with the intent of practicing only in Ohio.  FREED also stated to Kelsall that he had purchased a house, yacht, and a law office building in Ohio, thereby demonstrating his intent of moving to and practicing solely in Ohio.  These statements were false.

62.     It is believed that FREED is still practicing law in the greater San Diego County.

63.     On October 1, 2018, KLS and WJF Corp entered into a "Promissory Note" associated for the sale of FREED'S legal practice.  On October 17, 2018, 815 Civic Center Drive LTD ("815CC") and Freed enter into a "Performance Agreement," whereby Kelsall provides a "Personal Guarantee" for the performance of 815CC (hereinafter collectively the "Promissory Note").

64.     Prior to the AGREEMENT and Promissory Note finalizing, FREED represented to CROSS-PLAINTIFFS that CROSS-PLAINTIFFS could use the adjacent building to 815 Civic Center as storage for the FREED Client files.

65.     FREED showed the adjacent building to CROSS-PLAINTIFFS in an attempt to impress and induce CROSS-PLAINTIFFS into purchasing the BUILDING with the FREED'S law practice.

66.     The AGREEMENT has the following provision in Section 3(1)(j):

Seller shall retain all of Seller's client files in the building or in their current location pending transfer of the Practice and files to Buyer upon closing hereof and consent of the client(s) or completion of the State Bar Procedure for same.

67.     Shortly after the AGREEMENT was finalized, FREED informed CROSS-PLAINTIFFS that the adjacent building was sold and that CROSS-PLAINTIFFS could not use the building for storage, thereby an additional cost was forced upon CROSS-PLAINTIFFS by FREED.

68.     FREED'S representation that the adjacent building could be used for storage of the client files was thus false and misleading.

69.     CROSS-PLAINTIFFS was forced to relocate the files to a storage unit, whereby incurring storage fees and moving fees.

### FIRST CAUSE OF ACTION

### Fraud

### (Kelsall Against All Cross-Defendants)

70.     CROSS-PLAINTIFFS re-alleges and incorporates, by reference, all foregoing paragraphs of the cross-complaint herein.

71.     FREED was a party to the AGREEMENT and knowingly and intentionally made false representations of material facts to Kelsall in order to deceive and induce Kelsall into entering the AGREEMENT and Promissory Note.

72.     FREED represented to Kelsall the material fact that FREED had "3,500 matters including 2,000 wills and trust matters." This misrepresentation was made in writing in the AGREEMENT, as well as, during several meetings between FREED and Kelsall and KLS in the summer of 2018.

73.     The dates where FREED'S misrepresentation was made to Kelsall are the following:

| 03/26/18 | 4:00PM |
| 4/10/18 | 9:00AM |
| 5/29/18 | 3:00PM |
| 7/11/18 | 2:30PM |
| 9/14/18 | 3:30PM |
| 9/25/18 | 4:00PM |
| 12/18/18 | 12:00PM |
| 2/14/19 | 3:00PM |

11 – CROSS-COMPLAINT

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

74.     The number of clients that FREED had in his law practice is a material fact because it was the leading factor in which Kelsall used in determining to purchase FREED'S law practice.

75.     FREED had knowledge that this representation of the number of clients he had was false because he had first-hand knowledge to the number of client files he actually possessed, which was less than 1,600.

76.     Because FREED had actual first-hand knowledge to the number of clients he actually had, FREED had knowledge and was aware that the material fact that he represented to Kelsall was false.

77.     FREED made this factual representation to Kelsall with the intention of deceiving and inducing Kelsall into the AGREEMENT to obtain Two Hundred Thousand Dollars ($200,000.00) from Kelsall for the purchase of FREED'S law practice.

78.     FREED's "3,500 matters including 2,000 wills and trust matters" representation to Kelsall and KLS was not true and accurate, and FREED knew that this representation was not true and accurate when he made it to Kelsall and KLS because he had firsthand knowledge of all matters that pertained to his law practice.

79.     FREED represented that he had conducted the "trust seminars" openly and truthfully to the prospective clients, whom in turn became "Freed Clients."

80.     FREED failed to disclose that at each and every seminar he or his representative represented that attendees would receive "lifetime services for free" on estate planning for a flat one-time fee that was to be paid at the seminar.

81.     FREED made this misrepresentation to the prospective clients that attended "trust seminars" on the following dates:

| April 20, 22, 24, 2004 | Temecula, CA |
|---|---|
| June 2, 5, 8, 2004 | Carlsbad, CA |
| July 28, 31, 2004 | Oceanside, CA |
| August 3, 2004 | |
| September 8, 11, 14, 2004 | Carlsbad, CA |

12 – CROSS-COMPLAINT

| | |
|---|---|
| October 13, 16, 19, 2004 | Temecula, CA |
| December 8, 11, 14, 2004 | Oceanside, CA |
| January 26, 29, 2005<br>February 1, 2005 | Carlsbad, CA |
| March 9, 12, 15, 2005 | Temecula. CA |
| April 27, 30, 2005<br>May 3, 2005 | Carlsbad, CA |
| June 8, 11, 14, 2005 | Oceanside, CA |
| July 6, 9, 12, 2005 | Temecula, CA |
| October 12, 15, 18, 2005 | Oceanside, CA |
| December 6, 14, 17, 2005 | Temecula, CA |
| February 1, 4, 7, 2006 | Oceanside, CA |
| March 29, 2006<br>April 1, 4, 2006 | Temecula, CA |
| May 31, 2006<br>June 3, 6, 2006 | Oceanside, CA |
| August 2, 5, 8, 2006 | Temecula, CA |
| October 10,14, 17, 2006 | Oceanside, CA |
| November 15, 16, 18, 2006 | Temecula, CA |
| February 10, 13, 15, 2007 | Oceanside, CA |
| March 21, 24, 27, 2007 | Temecula, CA |
| May 8, 12, 15, 2007 | Oceanside, CA |
| July 11, 14, 17, 2007 | Temecula, CA |
| September 11, 15, 18, 2007 | Temecula, CA |
| November 1, 3, 6, 2007 | Temecula, CA |
| January 22, 26, 29, 2008 | Oceanside, CA |

13 – CROSS-COMPLAINT

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

| March 12, 15, 18, 2008 | Fallbrook, CA |
| | Oceanside, CA |
| May 7, 10, 13, 2008 | Temecula, CA |

82.    FREED knew at the time of making these statements to the attendees that he did not intend to follow through with his promise to them of "lifetime services for free."

83.    FREED'S failure to disclose the "lifetime services for free" to Kelsall is a suppression of material fact because Kelsall would not have agreed to purchase the law practice for the AGREEMENT'S specified purchase price if he had known he would be expected to provide services to all these clients with no monetary benefit to himself. It is against logic that a person would expend funds to purchase a business/clients and then do work for free for the rest of time.

84.    This misrepresentation by FREED or his ostensible agent has resulted in numerous requests for "free legal services" to be provided by Kelsall and the absence of good will.

85.    Since FREED personally made the "lifetime services" representations to the "seminar" attendees or was present when his representative made the "lifetime services" representations to the "seminar" attendees, FREED had knowledge of this material fact and intentionally suppressed the fact in order to deceive and induce Kelsall into the AGREEMENT.

86.    FREED was aware that his ostensible agent was making false representations to the attendees of the "trust seminars" and yet did nothing to stop it. In or about 2005, FREED reminded his agent that the continuous misrepresentations impact FREED from a liability and ethical standpoint. That representation demonstrates FREED'S scienter and knowledge of the illicit and unethical solicitation of prospective clients that was not disclosed to Kelsall. The facts alleged above demonstrates the scienter of William Freed.

87.    FREED failed to disclose to Kelsall that numerous FREED clients that had already paid for services, without formal legal service agreements, had yet to receive the services for which they had already paid. FREED pocketed that money for his own monetary benefit with no intent to actually provide those services to the clients.

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

88.    This resulted in numerous requests for Kelsall to subsequently complete the unfinished estate planning for FREED clients for free or at a reduced rate, based on FREED's representations during the "seminars". FREED failed to disclose to Kelsall the ethical violations in the solicitation of prospective clients on the dates set forth in the paragraphs above.

89.    This is a suppression of yet another material fact because Kelsall is now forced to handle requests for free legal services from FREED clients, which in turn results in the loss of good will and promise of future legal services or providing legal services at a greatly reduced rate.

90.    FREED suppressed the fact that he only had approximately 1,600 clients by not disclosing his client list until after the AGREEMENT was executed.  Moreover, FREED further suppressed this fact by intentionally using "bulk mail" service, which does not provide the returned mail items, thereby further suppressing the number of incorrect addresses that FREED supplied to Kelsall.

91.    FREED promised Kelsall that FREED client files could be stored in the building adjacent to 815 Civic Center, which was owned by the Walwick family ("WALWICK BUILDING").  FREED made this promise without the intention of performing the promise because he did not have the authority to make such a promise.  Consequently, Kelsall were forced to remove all FREED client files from the adjacent building on or around February or March of 2019, and expending considerable money to do so. Kelsall continues to incur fees to store the FREED client files at an off-site storage facility.

92.    Kelsall justifiably relied on FREED'S representation that FREED had "3,500 matters including 2,000 wills and trust matters" when Kelsall agreed to purchase FREED'S practice.  Moreover, Kelsall justifiably relied on FREED'S representation when they agreed to purchase the BUILDING.

93.    FREED'S representation that FREED had "3,500 matters including 2,000 wills and trust matters" to Kelsall was made with the intention of deceiving and inducing Kelsall into the AGREEMENT and Promissory Note to obtain Nine Hundred Thousand Dollars ($900,000.00) from Kelsall for the purchase of the BUILDING.

94.    FREED represented to Kelsall that the purchase of the BUILDING was imperative to the viability of the law firm, since a large building is necessary to handle a large number of clients.  This is a material misrepresentation because FREED knew that the number of clients his law firm represented was

vastly lower than the "3,500 matters including 2,000 wills and trust matters" that he represented, therefore the purchase of BUILDING was not at all imperative to the viability of the law firm.

95.    FREED also represented to Kelsall that the purchase of the BUILDING, in addition to the law practice, would generate more business for Kelsall because the FREED clients already know the BUILDING.  Moreover, FREED represented to Kelsall that FREED'S "practice had been in the same place since 1954, so the BUILDING needs to be part of the deal," so FREED clients are comfortable returning to same location.  This is a material misrepresentation of material facts because FREED had knowledge that his client list contained people that had never been to BUILDING or, in fact, heard of FREED.

96.    FREED made the false representations to Kelsall with the intent to deceive and induce Kelsall into purchasing the BUILDING in addition to FREED'S law practice.

97.    Had Kelsall been aware of the actual number of FREED clients, Kelsall would not have purchased the BUILDING.

98.    As a result of FREED'S false representation, Kelsall have sustained monetary damages because Kelsall have lost clients that they were led to believe existed and have lost trust administrations and the good will of clients.

99.    Kelsall has also lost the prospect of future services to FREED clients because the false representation by FREED to the clients made the prospect of future services to the FREED clients worthless, since FREED clients believed that they would get all future services for free.

100.    Kelsall has been damaged in the amount paid to FREED, loss of business, loss of FREED clients that did not sign up for services, extra costs for storage of FREED client files, extra cost for cleanup and moving of FREED client files, and other compensatory damages in an amount within the jurisdiction of this court to be proven at the time of trial.

101.    FREED'S conduct constitutes conduct that is oppressive, fraudulent, and/or malicious, thereby entitling Kelsall to punitive damages under Civil Code 3294.

## SECOND CAUSE OF ACTION

### Intentional Misrepresentation

102.  CROSS-PLAINTIFF re-alleges and incorporates, by reference, all foregoing paragraphs of the cross-complaint herein.

103.  FREED purposefully and knowingly made false representations and misrepresentations to CROSS-PLAINTIFF regarding the actual number of FREED clients.  Those false representations were made or alleged and set forth in the AGREEMENT and Promissory Note.

104.  FREED falsely represented to CROSS-PLAINTIFF that FREED had over 3,500 clients including 2,000 wills and trust clients.  This false representation was made on several occasions in 2018, in order to induce CROSS-PLAINTIFFS into changing his position and paying over Thirty Thousand Dollars ($30,000.00) to FREED. In fact, CROSS-PLAINTIFF has discovered that FREED had less than 1,600 clients. This was determined by the number of returned mail and correspondence from people that stated they were never FREED clients or had never even heard of FREED.  FREED was aware of this fact because he had firsthand knowledge of the client files.

105.  FREED's false representation regarding the number of FREED clients also was intentionally made to induce CROSS-PLAINTIFF into purchasing BUILDING for Nine Hundred Thousand Dollars ($900,000.00) so that FREED could obtain over Six Hundred Thousand Dollars ($600,000.00) to purchase an office building in Ohio.

106.  The FREED client files, which were provided to CROSS-PLAINTIFF after the AGREEMENT was executed, consisted of files that contained outdated and or incorrect information of alleged client(s).  FREED was aware of this fact because he had firsthand knowledge of the client files.

107.  FREED intentionally made these false representations in order to make CROSS-PLAINTIFFS believe that FREED'S practice had a larger number of clients and that the business had more value than truly existed, to induce CROSS-PLAINTIFFS to purchase his practice and building.

108.  FREED intended for CROSS-PLAINTIFFS to rely on his false representations so that CROSS-PLAINTIFFS would purchase FREED'S legal practice and BUILDING so that he could realize over $600,000.00 in cash to fund the purchase of another office building in Ohio.

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

109.    CROSS-PLAINTIFFS justifiably relied on FREED'S false representation when they decided on purchasing FREED'S legal practice. Moreover, CROSS-PLAINTIFFS never intended to purchase the BUILDING. However, because FREED falsely represented the size of the practice, CROSS-PLAINTIFFS again, to their detriment, relied on the false representations and were induced into purchasing the BUILDING, whereby changing their position to their detriment.

110.    As a result of FREED'S false representations, CROSS-PLAINTIFF has incurred monetary damages in the form of loss of One Hundred Seventy Thousand Three Hundred Twenty-Three Dollars ($170,323.00) paid to FREED and the loss of clients. These losses include a One Hundred Thousand Dollar ($100,000.00) down payment on the BUILDING; a Twenty Thousand Dollar ($20,000.00) down payment on FREED'S law practice; a Four Thousand Dollar ($4,000.00) payment to FREED for the purchase of the law practice; Fourteen Thousand Eight Hundred Twenty-Three Dollars ($14,823.00) in monthly payments to FREED for the purchase of the law practice; Thirty-One Thousand Five Hundred Dollar ($31,500.00) in monthly payments for the loan on the BUILDING from November of 2018 through the current date, at the amount of One Thousand Five Hundred Dollars ($1,500.00) per month.

111.    CROSS-PLAINTIFF's legal reliance on FREED'S representations was a substantial factor in causing their harm because CROSS-PLAINTIFFS would not have purchased FREED'S law practice and BUILDING had they known the actual number of FREED clients and the truth about the legal practice.

112.    FREED'S conduct constitutes conduct that is oppressive, fraudulent, and/or malicious, thereby entitling CROSS-PLAINTIFFS to punitive damages under Civil Code 3294.

113.    CROSS-PLAINTIFFS therefore requests punitive and exemplary damages in an amount proven at trial.

//
//
//
//
//

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

### THIRD CAUSE OF ACTION

**Negligent Misrepresentation**

114.    CROSS-PLAINTIFFS re-alleges and incorporates, by reference, all foregoing paragraphs of the cross-complaint herein.

115.    CROSS-PLAINTIFF alleges that FREED negligently made false representations and misrepresentations via false information regarding the actual number of FREED clients.  Those false representations were made or alleged and set forth in the AGREEMENT.

116.    FREED represented to CROSS-PLAINTIFFS that FREED had 3,500 clients of which 2,000 dealt with wills and trust matters in order to induce CROSS-PLAINTIFFS into changing their position and paying Thirty-Eight Thousand Eight Hundred Twenty-Seven Dollars ($38,827.00) to FREED for the purchase of the law practice.  Furthermore, because FREED falsely represented the size of the practice, FREED induced CROSS-PLAINTIFF into purchase the BUILDING for Nine Hundred Thousand Dollars ($900,000.00) in order to adequately handle the business, and an additional Thirty-One Thousand Five Hundred Dollars ($31,500.00) in monthly payments from November of 2018 through the current date, as set forth in the paragraphs above.

117.    FREED'S representations were not true because the client files that were turned over to CROSS-PLAINTIFFS after the AGREEMENT was executed did not contain the number of files that FREED represented. This was determined by the number of returned mail and correspondence from people that stated they were never FREED clients or had never even heard of FREED.  FREED was aware of this fact because he had firsthand knowledge of the client files.

118.    Even though FREED may have honestly believed that there were 3,500 client files, which is highly doubtful because FREED was the sole attorney working and representing his clients and would have firsthand knowledge to the amount of clients he actually represented, FREED had no reasonable grounds to report to CROSS-PLAINTIFF the number of FREED clients was 3,500.

119.    FREED, in his capacity as the seller of the law practice, had a duty of care to CROSS-PLAINTIFF, whom were the buyers of the law practice and BUILDING.

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

120.    FREED had the duty of care to confirm that the number of clients he was representing to CROSS-PLAINTIFFS was true and accurate.  Furthermore, FREED had the duty to confirm that the contact information he had for his clients was accurate and updated.

121.    Because FREED failed the standard of care that FREED owed to CROSS-PLAINTIFF, FREED was negligent.

122.    FREED intended CROSS-PLAINTIFF to rely on his false representations so that CROSS-PLAINTIFFS would purchase FREED'S law practice and BUILDING so that FREED could obtain $600,000.00 to purchase an office building in Ohio.

123.    CROSS-PLAINTIFF justifiably relied on FREED'S false representation when they decided on purchasing FREED'S legal practice and BUILDING.  Moreover, CROSS-PLAINTIFF never intended to purchase the BUILDING. However, because FREED falsely represented the size of the practice, CROSS-PLAINTIFFS again, to their detriment, relied on the false representations and were induced into purchase the BUILDING, whereby changing their position to their detriment.

124.    As a result of FREED'S false representation, CROSS-PLAINTIFF has incurred monetary damages in the form of loss of One Hundred Seventy Thousand Three Hundred Twenty-Three Dollars ($170,323.00) paid to FREED and the loss of clients, as set forth in the paragraphs above.

125.    CROSS-PLAINTIFFS' reliance on FREED'S representation was a substantial factor in causing their harm because CROSS-PLAINTIFF would not have purchased FREED'S law practice and BUILDING had they known the actual number of FREED clients and the truth about the legal practice.

126.    FREED'S conduct constitutes conduct that is oppressive, fraudulent, and/or malicious, thereby entitling CROSS-PLAINTIFFS to punitive damages under Civil Code 3294.

127.    CROSS-PLAINTIFFS therefore requests exemplary and compensatory damages in an amount proven at trial.

//

//

//

//

20 – CROSS-COMPLAINT

### FOURTH CAUSE OF ACTION

#### Concealment

#### (Kelsall Against All Cross-Defendants)

128.    CROSS-PLAINTIFF re-alleges and incorporates, by reference, all foregoing paragraphs of the cross-complaint herein.

129.    Kelsall were harmed because FREED concealed material information as it pertained to the actual number of FREED clients and the Legal Service Agreements ("LSA") between FREED and his clients.

130.    FREED and Kelsall entered into and executed AGREEMENT on August 16, 2018, whereby FREED intentionally failed to disclose the actual number of FREED clients to Kelsall. Furthermore, FREED intentionally failed to disclose to Kelsall that FREED had entered into "lifetime agreements" with most of his clients for the work that FREED had performed.

131.    FREED intentionally failed to disclose that he had collected legal fees from clients but not had performed the work that he had been contracted to perform, and that he had no intention of doing so.

132.    FREED disclosed to Kelsall that he held "wills and trust seminars" all over San Diego County and other surrounding counties but intentionally failed to disclose that FREED promised the attendees of these "seminars" free lifetime revisions to their wills and trusts if they paid an extra fee that FREED collected at these seminars.

133.    At these "wills and trust seminars," FREED or his representative and ostensible agent made misrepresentations to prospective clients. The misrepresentations at the "seminars" were very similar because they came from FREED and his hired promoters. They all used the same script.

134.    FREED was aware that his ostensible agent was making false representations to the attendees of the trust seminars and yet did nothing to stop it. In one instance, FREED reminded his agent that the continuous misrepresentations impact FREED from a liability and ethical standpoint.

135.    The basic misrepresentation was that if the prospective clients paid a little more than other attorneys were charging for a trust package, then the prospective client would never again have to pay for anything related to their trust including amendments, modifications, or administration.

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

136.   The prospective clients were led to believe by FREED and his hired promoters, that they would never have to pay for updates, changes or modifications to their trust package and all trust work associated thereto would be done for free for life.

137.   FREED also sent prospective clients Trust Package Prices, which stated if the prospective clients purchased a trust package, then they would receive unlimited phone consultations.

138.   FREED concealed these material facts from Kelsall.  If Kelsall would have known these material facts, they would have changed their position and would not have purchased the practice.  It is illogical that a person would expend substantial amount of money to purchase a practice on the promise of future business, and then provide free work to clients for the rest of their lives, with no monetary benefit to himself.

139.   If Kelsall had known about the manner and methodology of the deceptive business practices of FREED, they would not have proceeded with the transaction.

140.   In the Fall of 2018, after the AGREEMENT was executed, Kelsall met in person with FREED, after Kelsall had met with one (1) of FREED'S clients.  The FREED clients that Kelsall had met with were a husband and wife couple that indicated to Kelsall that FREED had told them that "all changes to their trust were free for life."

141.   When Kelsall raised this issue with FREED during their meeting in 2018, FREED continued to misrepresent facts and conceal the truth from Kelsall by stating that FREED "had only told them that phone calls were free regarding any matter related to their trust."  FREED went on to state to Kelsall that the reason phone calls were free for clients he performed trust work for, was so that they would come back to have changes made to their trusts.

142.   While FREED'S statement sounds plausible, it was another instance of concealment by FREED to induce Kelsall into providing funds to FREED by making payments to FREED, which Kelsall did in good faith, not knowing that he had been defrauded by concealment.

143.   At this point, Kelsall had only experienced this singular instance of FREED's concealment, so Kelsall still were not aware that this basic scheme for selling trusts had been utilized by FREED at all

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

his trust seminars, with all of FREED's clients, and that all FREED clients expected "free legal services" from FREED for life.

144.    As and example, around November 2018, Kelsall met for the first time with Mr. Thompson, a former FREED client that paid FREED for the competition of a Trust package.  Mr. Thompson was a "seminar" attendee that paid FREED for complete a Trust package.  MR. Thompson stated to Kelsall that he met with Freed at the Building after the "Trust Seminar" and believed that FREED had completed Mr. Thompson's Trust.  After meeting with Mr. Thompson, Kelsall discovered that FREED never finished work on Mr. Thompson's Trust package, even though he had collected full payment. Kelsall only found what appeared to be incomplete drafts of a trust and no executed documents. Kelsall completed Mr. Thompson's Trust for a substantial discount.

145.    FREED failed to disclose the truth about the "seminar" at the detriment to the law practice, the law practice's value, the law practice's good will, and did so to dupe Kelsall  into purchasing the law practice and paying substantial funds to FREED to be proved at trial.

146.    One (1) huge detriment to the law practice was the outright refusal of clients to pay for amendments and updates to their trusts because FREED had stated to clients that there would be "no charges" for any additional changes.

147.    FREED stated to clients that there would be "no charge" for trust administrations.  Thus, when a spouse died, the surviving spouse that was a FREED client, expected Kelsall  to provide "free" trust administration services.

148.    Another detriment to the law practice was the refusal of FREED clients to accept and sign up for the firm's "continuing client program."  Kelsall  had disclosed  the firm's "continuing client program" to FREED and FREED indicated that it was a good idea, even stating that he had wished he had thought of it. Furthermore, FREED stated that he believed a majority of the FREED clients would sign up for the program. However, in fact, FREED clients did not sign up for the program.

149.    At no point did FREED disclose this information to Kelsall  or disclose any documentation, such as an LSA, that illustrated FREED'S representations to his alleged clients.

150.    Kelsall could not have discovered the LSAs or FREED'S representation between FREED and the seminar attendees, save for FREED's disclosure.

151.    FREED prevented Kelsall from discovering that Kelsall would have to perform free work that FREED had promised to his clients and had been paid for by not providing the FREED client files until after the AGREEMENT was executed.

152.    Kelsall had no knowledge of the lifetime LSAs between FREED and seminar attendees and could not have discovered same without disclosure by FREED. Kelsall only became aware of the lifetime LSAs once former FREED clients started to come into CROSS-PLAINTIFFS' office and request amendments to their wills and or trusts and expecting it to be done for free, based on misrepresentations at the "seminars" they attended.

153.    FREED intentionally concealed the aforementioned material facts because he intended to deceive Kelsall and quickly rid himself of his practice, whereby Kelsall would be induced into purchasing FREED'S practice and have to deal with all future clients' "free" requests.

154.    But for FREED'S intentional concealment of material fact, Kelsall would not have purchased FREED'S firm.

155.    As a result of FREED'S intentional concealment, Kelsall have incurred damages in the form of the amounts paid to FREED, lost revenue from clients he believed existed and lost revenue for work that he had to perform for former FREED clients.

156.    In addition, due to FREED's deceptive practices, when FREED clients are subsequently informed during their meetings with Kelsall that they will be charged for legal services related to their trust administration, they are offended, and decline additional representation.

157.    These undisclosed facts make the "good will" of the law firm non-existent and change it to "bad will" because the clients come to realize that they were cheated by FREED, whereby they then associate such "bad will" with Kelsall . Thus, Kelsall were defrauded into purchasing a law firm that had very little to no "good will" at all.

158.    FREED'S concealment is the substantial factor in causing Kelsall's damages because Kelsall would not have purchased FREED'S firm had Kelsall been privy to the full facts.

159.   If Kelsall had known about the misrepresentations to the clients by FREED, they would not have proceeded with either transaction for the clients nor the physical building.

160.   Moreover, FREED promised Kelsall that they could store FREED client files in the WALWICK BUILDING which is adjacent to BUILDING.  FREED intentionally concealed the fact that WALWICK BUILDING was actively marketed for sale.

161.   On or about January or February of 2019, the WALWICK BUILDING was sold and Kelsall was forced to move all of the client files from the WALWICK BUILDING into an offsite storage unit, expending considerable money to do so.

162.   As a result, Kelsall incurred monetary damages because they had to find new storage facilities and pay for the files to be moved.

163.   If Kelsall had known about the misrepresentations about the storage building by FREED, he would not have proceeded with either transaction for the clients nor the physical building.

164.   Since FREED was involved with the Walwick family, FREED had personal knowledge that the WALWICK BUILDING was going to be sold and intentionally concealed that fact from Kelsall at the time of the AGREEMENT execution.

165.   FREED'S conduct constitutes conduct that is oppressive, fraudulent, and/or malicious, thereby entitling Kelsall to punitive damages under Civil Code 3294.

166.   Kelsall therefore requests punitive and exemplary damages in an amount proven at trial.

### FIFTH CAUSE OF ACTION

**(Unlawful and Unfair Business Practices: Business & Professions Code §§ 17200 et seq.)**

167.   CROSS-PLAINTIFF re-alleges and incorporates, by reference, all foregoing paragraphs of the cross-complaint herein.

168.   By committing the alleged acts and or omissions in this Cross-Complaint, FREED engaged in unlawful, unfair, and or fraudulent business practices within the meaning of California Business & Professions Code § 17200 et seq.

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

169.    CROSS-PLAINTIFF alleges that, as a result of FREED'S alleged acts and or omissions as described in this Cross-Complaint, FREED unlawfully and unfairly caused monetary damage to CROSS-PLAINTIFF because of his unlawful and or unfair business practices.

170.    A request for declaratory relief and restitution is specifically authorized by California Business & Professions Code § 17200 et seq. Thus, CROSS-PLAINTIFF seeks all costs related to the rescission of the AGREEMENT and Promissory Note and lost profits due to the loss of clients, as a result of FREED'S alleged acts and/or omissions as described in this Cross-Complaint.  CROSS-PLAINTIFF also seeks attorneys' fees under Civil Code §1021.5, costs of suit, and interest.

171.    As the direct and proximate result of FREED'S fraud, CROSS-PLAINTIFF have been damaged in the form of lost wages and profits from the loss of clients, and in the form of money already expended to purchase the practice and the BUILDING, in an amount to be proved at trial.

172.    CROSS-PLAINTIFF therefore requests punitive and exemplary damages in an amount to be proven at trial, under Civil Code 3294.

173.    CROSS-PLAINTIFFS therefore requests damages for the injuries alleged above in a sum not less than the jurisdictional minimum of this court, according to proof at trial.

## SIXTH CAUSE OF ACTION

### (Breach of Covenant of Good Faith and Fair Dealing)

174.    CROSS-PLAINTIFF re-alleges and incorporates, by reference, all foregoing paragraphs of the cross-complaint herein.

175.    CROSS-PLAINTIFF's contracts with FREED constitutes a valid, enforceable, and binding contract. Under their AGREEMENT and Promissory Note, CROSS-PLAINTIFF were to purchase FREED'S firm, which included 3,500 client files, which included 2,000 wills and trust matters, and BUILDING. CROSS-PLAINTIFF would honor any agreement that FREED had with existing clients and had the right to negotiate new terms with new clients.

176.    The contracts contained an implied covenant of good faith and fair dealing, whereby FREED would provide a true and accurate number for client files.  Furthermore, FREED would provide true and accurate LSAs between FREED and existing FREED clients.

177.    Additionally, FREED expressed to CROSS-PLAINTIFF that FREED was no longer going to practice law in California.

178.    CROSS-PLAINTIFF performed all their obligations under the contracts with FREED. FREED was paid by CROSS-PLAINTIFF pursuant to the agreement in the amount of One Hundred Thirty-Eight Thousand Eight Hundred Twenty-Three Dollars ($138,823.00), as set forth in the paragraphs above.  FREED has violated the covenant of good faith and fair dealing by taking actions calculated to prohibit and deprive CROSS-PLAINTIFF of the benefits for which he bargained for in entering into a written agreement with FREED regarding the purchase of FREED'S practice, as explained in detail throughout this Cross-Complaint.  Such actions constitute a breach of FREED'S contractual obligations to CROSS-PLAINTIFF in that FREED refused to perform his obligations to CROSS-PLAINTIFF for the purpose of inducing CROSS-PLAINTIFFS into purchasing FREED'S practice.

179.    As a direct and proximate result of this conduct, CROSS-PLAINTIFF have suffered lost wages, lost legal fees, lost income, and lost profits as a result of lost clients and FREED clients that never existed in addition to money expended in purchasing the practice and BUILDING.  CROSS-PLAINTIFF are entitled to their lost revenue as a result of FREED'S breaches in the amount set forth below and for the costs and fees incurred in prosecuting this action.

180.    As a direct and proximate result of FREED'S conduct, CROSS-PLAINTIFF suffered loss of wages and lost profits from the loss of clients and FREED clients that never existed in addition to money expended in purchasing the practice and BUILDING in the amount of not less than the jurisdictional limit of this court to be proved at trial.

181.    CROSS-PLAINTIFF therefore request damages for the injuries alleged above in a sum not less than the jurisdictional minimum of this court, according to proof at trial.

### SEVENTH CAUSE OF ACTION

#### (Interference with Prospective Economic Advantage)

182.    CROSS-PLAINTIFFS re-alleges and incorporates, by reference, all foregoing paragraphs of the cross-complaint herein.

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

183.    Kelsall have an economic advantage in the form that they are one of the prominent lawyers in the area that primarily deal with wills and trusts. Had FREED performed his duties as expected and pursuant to the AGREEMENT, Kelsall would have been collecting revenue from their clients and former FREED clients since at least 2018.

184.    FREED's fraud on Kelsall interferes with the economic advantage they already enjoyed as an attorney in San Diego and Orange County, and diverted their resources to a legal business that interfered with the existing business due to Kelsall's attempt to handle all of the issues FREED created.

185.    FREED knew that Kelsall intended to provide legal services for wills and trust matters because that was the main attraction of Kelsall to FREED'S practice. Kelsall specifically stated to FREED that the purpose of purchasing the practice and BULIDING was to provide legal services for wills and trust matters.

186.    FREED, being an intelligent and competent human being and practicing attorney, knew or should have known that as a result of FREED's "seminars", misrepresentations and deceptive actions, Kelsall would subsequently not be able to receive profits from former FREED clients that had already paid FREED a high fee for lifetime services.

187.    As a direct result of FREED'S negligent actions and omissions, Kelsall have been damaged in an amount according to proof. For instance, and not in limitation, Kelsall have been damaged in the amount of profit that a client would have paid for wills and trust matters along with any existing "good will". Kelsall have been damaged in that their prospective economic advantage obtained from a relationship with legitimate clients has been harmed because there is now a negative connotation with Kelsall's practice because they cannot honor FREED'S lifetime LSAs.

188.    On October 21, 2020, CROSS-PLAINTIFFS received a letter from CROSS-PLAINTIFF's tenant stating that FREED has been collecting rent checks that are rightfully owed to CROSS-PLAINTIFFS since May 10, 2020. FREED'S wrongful collection of the rental income is made with malice and conscious disregard of the rights of CROSS-PLAINTIFS. CROSS-PLAINTIFF are entitled to the return of all rental income collected by FREED with interest.

189.    FREED'S actions were undertaken with fraud, malice or oppression, or with a conscious disregard of the rights of CROSS-PLAINTIFFS, and, therefore, CROSS-PLAINTIFFS are entitled to an award of exemplary and punitive damages against FREED in an amount according to proof.

190.    As a direct and proximate result of FREED'S actions and omissions, CROSS-PLAINTIFFS have suffered, and will continue to suffer, substantial damages.  CROSS-PLAINTIFF are entitled to their lost revenue suffered as a consequence of FREED'S conduct and for the loss of wages and profits due to the loss of clients and non-existent FREED clients, as set forth below and for the costs and fees incurred in prosecuting this action. Additionally, CROSS-PLAINTIFF are entitled to their lost money expended in purchasing the practice and BUILDING under false pretenses.

191.    As the direct and proximate result of FREED'S actions and omissions, CROSS-PLAINTIFF suffered damages in the amount of loss of revenue and profits due to the loss of clients and non-existent FREED clients to be proved at trial and in money expended in purchasing the practice and BUILDING.

192.    CROSS-PLAINTIFF therefore requests, actual, punitive, and exemplary damages in an amount to be proven at trial.

193.    CROSS-PLAINTIFF therefore requests damages for the injuries alleged above in a sum not less than the jurisdictional minimum of this court, according to proof at trial.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, CROSS-PLAINTIFFS pray for judgment as follows:

<u>As to the Fist Cause of Action for Fraud (Kelsall and KLS Against All Cross-Defendants</u>

1.    For compensatory damages from work that Kelsall and KLS performed for FREED clients at a discounted rate;

2.    For compensatory damages from work that Kelsall and KLS lost as a result of FREED'S fraudulent conduct;

3.    For damages from the cost of having to rent storage and the moving cost of moving the FREED files to a rental storage unit;

4.      For damages from future work that Kelsall and KLS has lost as a result of loss of good will because of FREED'S conduct;

5.      For rescission and or revocation of the Agreement and Promissory Note;

6.      For damages for all amounts of money paid to FREED by CROSS-PLAINTIFFS.

7.      For pre-judgement interest under Civil Code §3287;

8.      For exemplary and punitive damages;

9.      For attorneys' fees and costs;

10.     For costs of suit incurred herein;

11.     For such other and further relief as the court deems just and proper;

As to the Second Cause of Action for Purposefully and Knowingly Making False Misrepresentations

12.     For compensatory damages from work that CROSS-PLAINTIFFS performed for FREED clients at a discounted rate;

13.     For compensatory damages from work that CROSS-PLAINTIFFS lost as a result of FREED'S fraudulent conduct;

14.     For damages from the cost of having to rent storage and the moving cost of moving the FREED files to a rental storage unit;

15.     For damages from future work that CROSS-PLAINTIFFS has lost as a result of loss of good will because of FREED'S conduct;

16.     For rescission and or revocation of the Agreement and Promissory Note;

17.     For punitive and exemplary damages;

18.     For pre-judgment interest under Civil Code §3287;

19.     For attorneys' fees and costs;

20.     For costs of suit incurred herein;

21.     For such other and further relief as the court deems just and proper;

As to the Third Cause of Action for Negligently Making False Misrepresentations

22.     For compensatory damages from work that CROSS-PLAINTIFFS performed for FREED clients at a discounted rate;

23-01962-MM7

Adversary Proceeding No.: 23-90064-MM

23. For compensatory damages from work for FREED clients that CROSS-PLAINTIFFS lost as a result of FREED'S fraudulent conduct;

24. For damages from future work that CROSS-PLAINTIFFS has lost as a result of loss of good will because of FREED'S conduct;

25. For rescission and or revocation of the Agreement and Promissory Note;

26. For attorneys' fees and costs;

27. For costs of suit incurred herein;

28. For such other and further relief as the court deems just and proper;

As to the Fourth Cause of Action for Concealment (Kelsall and KLS Against All Cross-Defendants)

29. For compensatory damages from work that Kelsall and KLS performed for FREED clients at a discounted rate;

30. For compensatory damages from work that Kelsall and KLS lost as a result of FREED'S fraudulent conduct;

31. For damages from the cost of having to rent storage and the moving cost of moving the FREED files to a rental storage unit;

32. For damages from future work that Kelsall and KLS has lost as a result of loss of good will because of FREED'S conduct;

33. For rescission and or revocation of the Agreement and Promissory Note;

34. For pre-judgement interest under Civil Code §3287;

35. For exemplary and punitive damages;

36. For attorneys' fees and costs;

37. For costs of suit incurred herein;

38. For such other and further relief as the court deems just and proper;

As to the Fifth Cause of Action for Unlawful and Unfair Business Practices

39. For an Order compelling Defendant to repay all monies paid by CROSS-PLAINTIFFS for the purchase of FREED'S law practice and building (in the form of restitution);

40. For issuance of a permanent injunction enjoining Defendant, from continuing to engage in

31 – CROSS-COMPLAINT

the unlawful and unfair business practices alleged herein;

41.    For pre-judgment interest under Civil Code §3287;

42.    For attorneys' fees and costs;

43.    For punitive and exemplary damages;

44.    For costs of suit incurred herein;

45.    For such other and further relief as the court deems just and proper;

As to the Sixth Cause of Action for Breach of Covenant of Good Faith and Fair Dealing

46.    For an Order compelling Defendant to repay all monies paid by CROSS-PLAINTIFFS for the purchase of FREED'S law practice and building (in the form of restitution)

47.    For compensatory damages from work that CROSS-PLAINTIFFS performed for FREED clients at a discounted rate;

48.    For compensatory damages from work that CROSS-PLAINTIFFS lost as a result of FREED'S fraudulent conduct;

49.    For pre-judgment interest under Civil Code §3287;

50.    For attorneys' fees and costs;

51.    For costs of suit incurred herein;

52.    For such other and further relief as the court deems just and proper;

As to the Seventh Cause of Action for Interference with Prospective Economic Advantage

53.    For an Order compelling FREED to repay all monies paid by CROSS-PLAINTIFF for the purchase of FREED'S law practice and building (in the form of restitution);

54.    For an Order compelling FREED to repay all rental income FREED collected from CROSS-PLAINTIFF'S tenants;

55.    For compensatory damages from work that CROSS-PLAINTIFF performed for FREED clients at a discounted rate;

56.    For compensatory damages from work that CROSS-PLAINTIFF lost as a result of FREED'S fraudulent conduct;

57.    For pre-judgment interest under Civil Code §3287;

58.    For punitive and exemplary damages;

59.    For attorneys' fees and costs;

60.    For costs of suit incurred herein;

61.    For such other and further relief as the court deems just and proper;


DATED: November 9, 2023                              **KELSALL LEGAL SOLUTIONS PC**


                                                    Samuel Kelsall V, Esq.
                                                    *Attorney for Cross-Plaintiffs*